IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| BARJAN, LLC, individually and on behalf of all others similarly situated, | : : : |
| Plaintiff, | : CIVIL ACTION NO._____ : : |
| v. | : : |
| ARKANSAS BEST CORPORATION, AVERITT EXPRESS, CON-WAY, INC., FEDEX CORPORATION, JEVIC TRANSPORTATION, INC., NEW ENGLAND MOTOR FREIGHT, INC., OLD DOMINION FREIGHT LINE, INC., R+L CARRIERS, INC., SAIA, INC., UNITED PARCEL SERVICE, INC. and YRC WORLDWIDE INC., | : CLASS ACTION COMPLAINT : : : JURY TRIAL REQUESTED : : : : : : |
| Defendants. | : : |

Plaintiff, Barjan, LLC, on behalf of itself and all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants, demands a jury trial, and alleges as follows:

## NATURE OF THE CASE

1. This case arises from a conspiracy to fix fuel surcharges for less-than-truckload shipments ("LTL") of goods. LTL is defined as the service of providing freight shipment, for carriage by truck, when the freight to be shipped by a customer is less than a full truckload. Excluded from this definition are small package shipments, shipments of furniture and personal affects by persons moving from one house to another and intermodal shipments.

2. Plaintiff brings this action on behalf of itself and a class who paid a collusively set, supra-competitive, fuel surcharge on LTL services from September 2003 through the present.

3.      Defendants' price-fixing conspiracy has directly and proximately caused injury to Plaintiff in its property. As a direct and proximate result of the unlawful agreement and activity alleged herein, Plaintiff paid higher prices for LTL services than it otherwise would have paid.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, for injuries sustained by Plaintiff and the Class as a result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in this Complaint.

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

6.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because during the Class Period, Defendants and/or their co-conspirators resided, transacted business, or were found, in this District, or because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

7.      This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; and/or (b) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**PLAINTIFF**

8.      Plaintiff Barjan, LLC ("Barjan") is a Delaware corporation with its principal place of business in Rock Island, Illinois.  During the Class Period, Barjan purchased LTL services directly from one or more of the Defendants and paid a collusively set and imposed fuel surcharge.

**DEFENDANTS**

9.      Defendant Arkansas Best Corporation ("ABF") is a trucking conglomerate incorporated in Delaware offering LTL services under a variety of business names and wholly-owned alter-ego subsidiaries, including ABF, ABF Freight System, ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc.  ABF's headquarters are located at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

10.     Defendant Averitt Express ("AE") is a privately held LTL company incorporated in Tennessee.  AE's headquarters are located at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee 38502.

11.     Defendant Con-Way, Inc. ("CW") provides LTL services.  CW is incorporated in Delaware and has its headquarters at 2855 Campus Drive, Suite 300, San Mateo, California 94403.

12.     Defendant FedEx Corporation ("FedEx") provides LTL services.  FedEx is a Delaware corporation with its principal place of business located at 942 South Shady Grove Road, Memphis, Tennessee 38120.

13.     Defendant Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation and LTL services provider.  Jevic's headquarters are located at 600-700 Creek Road, Delanco, New Jersey 08075.

14. Defendant New England Motor Freight, Inc. ("NEMF") is an LTL company incorporated in New Jersey. NEMF's headquarters are located at 1-71 North Avenue East, Elizabeth, New Jersey 07201.

15. Defendant Old Dominion Freight Line, Inc. ("ODFL") is a Virginia corporation that derives most of its business from LTL services. ODFL's headquarters are located at 500 Old Dominion Way, Thomasville, North Carolina 27360.

16. Defendant R+L Carriers, Inc. ("RLC") is a privately held LTL company, incorporated in Ohio. RLC operates under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount Transportation. RLC's headquarters are located at 600 Gillam Road Wilmington, Ohio 45177.

17. Defendant Saia, Inc. ("Saia") is an LTL company incorporated in Delaware. Saia's headquarters are located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097.

18. Defendant United Parcel Service, Inc. ("UPS") is a Delaware corporation. UPS's headquarters are located at 55 Glendale Parkway, NE, Atlanta, Georgia 30328. UPS entered the LTL market by acquiring the assets of Overnite Transportation Company, one of the largest LTL companies operating in the United States.

19. Defendant YRC Worldwide, Inc. ("YRC") is a trucking company incorporated in Delaware, which provides LTL services using its own and several other brand names. YRC's headquarters are located at 10990 Roe Avenue, Overland Park, Kansas 66211.

## CO-CONSPIRATORS AND AGENTS

20. Wherever in this Complaint reference is made to any act, statement or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act

or transaction, or made the statement, by or through its officers, directors, members, partners, agents, employees or representatives while they were engaged in the management, direction, control or conduct of the corporation's or entity's business or affairs and acting within the scope of their authority.

21. Various other persons, firms and corporations not named as Defendant herein have participated as co-conspirators in the violations alleged herein and have aided, abetted and performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

22. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate commerce. During the Class Period, Defendants and their co-conspirators sold and provided LTL services in a continuous and uninterrupted flow of interstate commerce.

## CLASS ACTION ALLEGATIONS

23. Plaintiff brings this action against Defendants under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All persons and entities who purchased LTL services directly from and paid a fuel surcharge directly to Defendants from September 13, 2003 to the present.  Excluded from the Class are government entities, Defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

24. The Class is comprised of persons throughout the United States, making individual joinder impractical, in satisfaction of Federal Rule of Civil Procedure 23(a)(1).  The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court.

25. Plaintiff believes Class Members number in the thousands, the exact number and identities being known only by Defendants.

26. The claims of Plaintiff are typical of the claims of the Class as required by Federal Rule of Civil Procedure 23(a)(3), in that Plaintiff purchased LTL services from and paid a fuel surcharge directly to Defendants.

27. There are questions of law and fact common to the Class. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof. The questions include but are not limited to:

   a. Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize fuel surcharges imposed on purchasers of LTL services;

   b. The identity of participants in the conspiracy;

   c. Whether the alleged conspiracy violated Section 1 of the Sherman Act;

   d. The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

   e. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the property of Plaintiff and other members of the Class;

   f. The effect of Defendants' conspiracy on the existence and amount of fuel surcharge to purchasers of LTL services during the Class Period; and

   g. The appropriate measure of damages sustained by Plaintiff and other members of the Class.

28. Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Federal Rule of Civil Procedure 23(a)(4). Plaintiff has retained counsel with substantial experience in the prosecution of nationwide class actions. Plaintiff and its counsel are committed to the vigorous prosecution of this action on behalf of the Class, and have

the financial resources to do so. Plaintiff does not have any interests adverse to those of the Class.

29. Plaintiff and members of the Class have suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Federal Rule of Civil Procedure 23(b)(3). Absent a class action, most members of the Class would likely find the cost of litigating their claims to be prohibitive, and would have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

## STATEMENT OF FACTS

30. Plaintiff and other members of the Class utilize LTL services to transport freight within North America.

### A. Inception And Operation Of The Price-Fixing Conspiracy

31. LTL service is a commodity product that is fungible in the sense that LTL service provided by any one of the Defendants may be substituted for the LTL service provided by any other Defendant. Plaintiff and Class Members purchase LTL services primarily on the basis of price.

32. The LTL service industry in the United States is highly concentrated, which facilitates coordination of prices. During the Class Period, a relatively small number of entities, consisting primarily of the Defendants, accounted for the majority of LTL service business in the United States.

33. Entry into the LTL industry requires a considerable amount of time, resources, and industry knowledge. Practical entry into the industry is both expensive and risky, and requires, among other things: the purchase or lease of hundreds of trucks and dozens of truck depots; obtaining significant market share from existing providers; the need for truck drivers in an already tight labor market; and significant advertising expenses in order to build a recognizable brand name.

34. Furthermore, even for potential shipping experts who possess the capital and know how necessary to enter the market, viable entry into the LTL market takes a considerable amount of time. Exemplifying this fact, when package shipping leaders FedEx and UPS decided to enter the LTL market, they purchased and rebranded already existing LTL companies rather than attempting to enter the market starting from scratch.

35. LTL service users cannot stock up on LTL services when prices are low, then use this stockpile when shipping prices are high.

36. The Defendants are horizontal competitors at the retail level of distribution.

37. The firms that make up the LTL industry have similar cost structures. There is a high ratio of fixed to variable costs. Capital equipment, software, advertising, driver recruitment and training, and other capital costs are high relative to variable costs. No Defendant is significantly more efficient than the industry average.

38. The LTL industry is mature and is therefore characterized by slim profit margins, creating a motivation to collude.

39. The LTL industry has a history of "cooperation." For example, several regional LTL companies have formed alliances with other regional LTL companies under the alleged purpose of offering nationwide services. In reality, however, these alliances include many more

companies than would be required to offer such services. The amount of cooperation within the trucking industry is higher than in similar industries, and has essentially created a level of trust within the industry that has facilitated Defendants' collusion.

40. The LTL industry has also become increasingly concentrated. For example, in 2003, Defendant YRC, then operating under the names Yellow Freight System and Yellow Transportation, merged with Roadway, then one of the largest LTL companies. The combined Yellow Roadway entity subsequently merged in 2005 with USF, another major LTL company, further increasing LTL market concentration.

41. Defendants publish their prices, and frequently use identical pricing software.

42. When discussing mergers and sales of assets from one Defendant to another, Defendants exchange non-public competitively sensitive financial information, which enables them to audit and gauge their co-conspirators' compliance in imposing supra-competitive fuel surcharges.

    **B.**  <u>**Cost of Fuel for Trucking Operations**</u>

43. Fuel cost is the single substantial cost to Defendants that is subject to wide variation in price. When a company's variable costs increase, without an offsetting increase in demand, the profits of the company will decrease unless the company can pass on the cost increase to its customers. Here, Defendants have not only passed on fuel price increases, they charged more than fuel price increases, turning fuel cost increases into a profit center.

44. Beginning in 2003, Defendants faced drastically increased fuel costs and the likelihood of lower profits. As a result, Defendants collusively imposed on their customers what are claimed to be fuel surcharges. In reality, however, these fuel surcharges bear little relation to the increase in Defendants' fuel costs. Higher fuel costs were merely an opportunity

for Defendants to agree amongst themselves to impose collusive price increases under the guise of fuel surcharges.

    45.    Observers of the LTL industry, and even some Defendants, have noted the direct relationship between high fuel prices and LTL profits. For example:

    a.    A 2006 article in *Traffic World,* a weekly trade publication covering the transportation and logistics industry, quoted Ken Hazen, president of transportation software and freight payment firm CTSI, as describing fuel surcharges as " 'a profit center now ... Carriers are in control. They're in the catbird seat. '"

    b.    A 2005 article in *Fleet Owner,* a trade magazine for executives and managers of commercial trucking fleets, noted that in the past, increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices: "High diesel fuel prices usually signal harsh times for trucking ... That doesn't seem to be the case this year."

    c.    In its 2006 annual report, Defendant ODFL admitted that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability: "A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes."

    d.    Defendant YRC admitted in its 2006 annual report: "In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term."

    e.    Additionally, in its 2006 annual report, Defendant ABF noted that "as diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other

fuel and energy related areas, operating margins could be negatively impacted."

46. These admissions are in striking contrast to the domestic passenger airline industry. For example, in its 2006 annual report, Southwest Airlines noted: "The cost of fuel, which was at a historically high level over the last two years, is largely unpredictable, and has a significant impact on the Company's results of operations ... Due to the competitive nature of the airline industry, the Company's ability to increase fares is limited."

47. In its 2006 annual report, United Airlines made a similar observation: "At times United has not been able to increase its fares when fuel prices have risen due to the highly competitive nature of the airline industry, and it may not be able to do so in the future ... "

48. On December 15, 2004, the *International Herald Tribune* published an article entitled, "Fuel Costs wipe out airline profit despite travel rebound," The article noted, "The airline industry is experiencing huge growth worldwide, in a recovery from several rough years after the September 11, 2001 terrorist attacks and regional problems like sever acute respiratory syndrome, or SARS. But the escalation in fuel prices produced another huge loss for the industry this year."

    **C.** **How the Cartel Functioned**

49. LTL companies began imposing increasingly high fuel surcharges when fuel prices began to increase in the early 2000s.

50. Defendants agreed to impose identical or nearly identical fuel surcharges by agreeing to tie the fuel surcharges to an index of diesel fuel prices published by the United States Department of Energy ("Fuel Index"). Moreover, in order to communicate movements in pricing and to police the cartel, each of Defendants lists its fuel surcharges on its website. As a result, Defendants' fuel surcharges move in lockstep.

51. The amount of the fuel surcharge imposed by the LTL companies on shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the increase in fuel prices since the fuel surcharge was implemented.

52. For example, when referring to its LTL service, FedEx Freight, Defendant FedEx noted: "While fuel costs increased substantially in 2006, fuel surcharges *more than* offset the effect of higher fuel costs ..." Likewise, Defendant CW has stated: "As fuel prices have risen, the fuel surcharge has increased Con-Way Freight's yields and revenue, and Con-Way Freight has *more than* recovered higher fuel costs and fuel-related increases in purchased transportation."

### D.  **Effects of the Unlawful Horizontal Agreement in Restraint of Trade**

53. The unlawful contract, conspiracy, or combination alleged above had the following effects:

   a. Prices charged by Defendants and their co-conspirators to Plaintiff and Class Members for fuel surcharges on LTL services were maintained at artificially high and noncompetitive levels; and

   b. Plaintiff and Class Members were required to pay more for LTL services than they would have paid in a competitive marketplace unaffected by Defendants' and their co-conspirators' collusive and unlawful price fixing.

54. During and throughout the period of the contract, conspiracy, or combination alleged above, Plaintiff and Class Members directly purchased LTL services from Defendants and paid fuel surcharges to Defendants.

55. Plaintiff and Class Members paid more for the fuel surcharges on LTL services than they would have paid under conditions of free and open competition.  As a direct and proximate result of the illegal contract, conspiracy, or combination alleged above, Plaintiff and

Class Members were injured and financially damaged in their property, in amounts that are not presently determinable.

## INJUNCTIVE RELIEF

56. Defendants' unlawful combination or conspiracy has eliminated or reduced competition, and this ongoing pattern of illegal conduct will continue to cause Plaintiff and Class Members economic losses, and to hamper competition for LTL services.

57. A monetary judgment in this case will only compensate Plaintiff and Class Members for past losses. A monetary judgment will not restore competition.

58. No individual customer of any Defendant has an adequate remedy at law.

## COUNT I
### Violation of Section 1 of the Sherman Act -- 15 U.S.C. § 1

59. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

60. From at least September 13, 2003, and continuing through to the present, Defendants and their co-conspirators have combined, conspired and/or contracted restrain interstate trade in violation of 15 U.S.C. § 1.

61. In furtherance of this unlawful combination and conspiracy, upon information and belief, each of the Defendants and their co-conspirators have committed overt acts, including, *inter alia.*

　　a.　Agreeing to charge, and charging, prices at certain levels and to otherwise fix, increase, maintain, and/or stabilize the amount of fuel surcharges on LTL services; and

　　b.　Communicating with co-conspirators regarding the amount to be charged for fuel surcharges on LTL services.

62. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise, and/or

13

stabilize the prices of fuel surcharges on LTL services and thus on LTL services.

63. Defendants' anti-competitive agreement was implemented by, among other things, instituting surcharges calculated by reference to publicly published indices. Once this agreement was in place, Defendants coordinated price increases continued on a regular basis, through the present, with the actual and intended result that Plaintiff and Class Members pay supra-competitive prices for fuel surcharges on LTL services. Defendants improperly attributed these price increases to the cost of fuel. As a direct and proximate result of these collusive fuel surcharges, Defendants have restrained competition in the LTL market. This competitive restraint has injured Plaintiff and Class Members in their property by forcing them to pay a higher price for fuel surcharges on LTL services than they would have paid absent the unlawful conduct alleged herein.

64. Indeed, recently FedEx broke ranks with the other Defendants and lowered its fuel surcharge to increase market share.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that:

A. The Court determines this action may be maintained as a class action under Federal Rule of Civil Procedure 23.

B. The contract, combination or conspiracy by Defendants and their co-conspirators be adjudged to be in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

C. Judgment be entered for Plaintiff and the Class against Defendants for three times the actual amount of damages sustained by Plaintiff and the Class as mandated by law, together with the costs of this action, including reasonable attorneys' fees.

D. Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

1. Continuing, maintaining, or renewing the contract, combination, or conspiracy alleged in this Complaint, engaging in any other contract, combination, or conspiracy having a similar purpose or effect, and adopting or following any practice, plan, program, or device having a similar effect or purpose; and

2. Communicating or causing to be communicated to any other person engaged in the distribution or sale of any LTL service prices or proposed prices for LTL service or fuel surcharges except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E. Plaintiff and Class Members obtain such other relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: September 13, 2007              */s/* Gregory P. Hansel
                                       _____
                                       Gregory P. Hansel
                                       PRETI, FLAHERTY, BELIVEAU
                                       & PACHIOS, LLP
                                       One City Center
                                       P.O. Box 9546
                                       Portland, ME 04112-9546
                                       (207) 791-3000

Joseph C. Kohn
Douglas A. Abrahams
William E. Hoese
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Steven D. Irwin
David V. Weicht
LEECH TISHMAN FUSCALDO & LAMPL, LLC
1800 Frick Building
Pittsburgh, PA 15219
(412) 261-1600

Counsel for Barjan, LLC, and the Proposed Class